O'BRIEN *v.* EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES.

INSURANCE—GUARANTY OF SURPLUS—POLICY.

> Where defendant insurance corporation furnished for the use of its agents as an illustration of the working of a tontine policy a printed statement containing an estimate of the cash value, reserve and surplus at the end of the tontine period, based on past experience, stating that the reserve was guaranteed as to amount, but the surplus would depend on experience, and, although the insurer guaranteed the surplus, its amount could not be determined in advance, defendant was not a guarantor of the estimated surplus, so as to entitle plaintiff to recover the amount as estimated in the illustration blank, attached to the policy, and judgment should have been entered for the actual surplus earned.

Error to Hillsdale; Chester, J. Submitted November 14, 1912. (Docket No. 147.) Decided December 17, 1912.

Assumpsit by Joseph W. O'Brien against the Equitable Life Assurance Society of the United States on a policy of insurance. The court directed a verdict for plaintiff. Defendant brings error. Reversed.

*Miller, Smith, Paddock & Perry*, for appellant.
*Smith, Baldwin & Alexander*, for appellee.

Stone, J.   This is an action in assumpsit, brought to recover the sum of $2,210.05 and interest, claimed to be due the plaintiff as cash surplus on what is termed a free tontine policy issued to him in 1891 by the defendant. Plaintiff was solicited to take this policy by one Halsey, of Grand Rapids, whom he calls a special agent of the defendant.   After some conferences with Halsey, the plaintiff, at Grand Haven, on February 28, 1891, applied for the policy in question, and paid the first premium thereon, and took a receipt therefor, signed by said Halsey as special agent.   On March 17, 1891, the policy was issued in New York, and presumably sent to Halsey, because thereafter it was delivered to the plaintiff by Halsey. The policy is Exhibit I, and is hereinafter set forth. When so delivered, according to the claim and testimony of the plaintiff, there was pinned to the policy the illustration blank, or "green slip," Exhibit II.

The policy was in words and figures following:

Exhibit I.

[Body of Policy.]

120 Broadway, New York.

Equitable Life Assurance Society of the United States.

Premium, $155.50.   Amount, $5,000.   Age 30.   No. 520,424.

William Alexander, Secretary.   Thomas J. Jordan, Assistant Secretary.   S. D. Ripley, Cashier.   James B. Loring, Registrar. President, Henry B. Hyde.   George W. Phelps, Actuary.   J. G. Van Cise, Assistant Actuary.   James W. Alexander, Vice President.   Samuel Borrowe, Second Vice President.   Edward W. Scott, Third Vice President.   John A. McCall, Comptroller.

In consideration of the written and printed application for this policy, which is hereby made a part of this contract, and of the payment in advance of one hundred and fifty-five dollars and fifty cents, and of the annual payment of $155.50 to be made thereafter at the office of the Society in the city of New York on or before the 10th day of March in every year (provided that when premium for twenty full years shall have been duly paid to said Society, no further premiums will be required).

Does promise to pay to Mary E. O'Brien, if living, if not then to her husband, Joseph W. O'Brien, his executors, administrators or assigns, at the office of the Society in the city of New York, Five

THOUSAND DOLLARS, upon satisfactory proofs of the death of said Joseph W. O'Brien, of Grand Haven, in the county of Ottawa, State of Michigan.

New York, the 17th day of March, A. D. 1891.

J. B. LORING, Registrar.

H. B. HYDE, President.

New Free Tontine.   No. 89.   Second Edition.

Examined by------------------

NOTICE.—No person except one of the executive officers named above is authorized to make, alter, or discharge contracts or waive forfeitures.

[On the back of policy, in red.]

List of privileges, the details of which will be found in the application.

This policy becomes incontestable two years from its date of issue. It provides for a paid-up policy after three years for as many twentieths of the original policy as complete annual premiums have been paid. It grants freedom of residence, travel, and occupation after one year. It gives to Joseph W. O'Brien a choice of six methods of settlement upon the completion of the tontine period, on the 10th day of March, 1911 (March 10, 1911) namely:

1. The surrender of the policy for its full value consisting of the entire reserve, amounting to $2,335.00, twenty-three hundred and thirty-five dollars, together with the surplus then apportioned by the Society, either in (1) cash; (2) paid-up assurance; (3) a life-annuity, or

2. The continuance of the policy and the withdrawal of the accumulated surplus, either in (1) cash; (2) paid-up assurance; (3) an annuity.

W. ALEXANDER, Secretary.

H. B. HYDE, President.

[On the front of the policy, in red.]

No. 520,424.

The Equitable Life Assurance Society of the United States.

120 Broadway, New York.

Free Tontine Policy.

Assurance on the Life of J. W. O'Brien.

No dividend will be declared on this policy until the 10th day of March, 1911.

Amount $5,000.

Term, life, 20 A. P.

First payment, $155.50.

Premium due 10th March, $155.50.

Register date of policy, 10th March, 1891.

American Bank Note Company, New York.

"William Halsey," at the bottom, written on the bottom of the policy, and *the indorsement, indorsed at the bottom,* "William Halsey."

EXHIBIT II.
[Front.]
For Use in 1891.
FREE TONTINE ILLUSTRATION BLANK.
For 10, 15 or 20 Payment Life Policies, with Corresponding Tontine Periods.

|  | Premiums payable for | } | 20 |
|---|---|---|---|

Policy $5000.00                    Tontine Period    } yrs.
   Age 30      Annual Premium_____ $155.50
Total premiums paid in 20 years_____$3,110.00
*Results at the end of the Tontine Period,*
*on the basis explained on the other side of*
*this sheet:*

1.  *Cash Value,* Consisting of
                     Reserve  _____ $2,334.95
                     and *Surplus* _____ 2,210.05      $4,545.00
2.  *Paid-Up Value*    (see note on other side)      $9,700.00
3.  *Cash Surplus* _____$2,210.00
       Under   this   settlement,   the   policy
       holder   withdraws   the   surplus   in
       cash, and retains the original policy,
       which is now fully paid up for $5,000,
       or the surplus may be used to buy an
       *Annuity* to continue with the paid-up
       assurance during the life time of the
       policy holder, about $180.00 per year.
                          WM. HALSEY, AGENT.

Dated at Grand Rapids, 3—4—1891.

N. B.—The foregoing blank must be filled up from the Book of *Tables* issued during the current year by the Equitable Life Assurance Society of the United States, and based on the Society's actual experience up to 1891.

[Back of Exhibit II.]
THE ADVANTAGES OF A FREE TONTINE POLICY SHOWN BY AN
ILLUSTRATION BASED ON ACTUAL EXPERIENCE.

The fund belonging to the policy holder at the end of the tontine period, consists of two parts: (1) The *Reserve,* which is a fixed quantity, may be stated in advance, and, if desired, may be written in the policy. (2) The Surplus (popularly known as "profits" or "dividends"), which is a varying quantity, depending on future

experience. One of the chief recommendations of the Free Tontine Policy is that the Society guarantees the payment of the *Entire Reserve* at the end of the tontine period. The *Surplus* is guaranteed also, but its *amount* cannot be determined in advance. Calculations, however, based on the experience of the past, show approximately the surplus profits which would be payable with such a policy, if it had been issued by the Society 10, 15, or 20 years ago, and ended its tontine period today. While the results of the future must necessarily depend on the experience of the future, figures based on past experience furnish the best attainable data upon which to judge of the management of the Society, and the value of the policies now offered.

The Free Tontine Policy grants many benefits denied under all older forms. It gives *absolute freedom* as to *travel, residence* and *occupation* after *one year*, and becomes incontestable after *two years*.

NOTE.—Where the paid up value of the policy, at the end of the tontine period, exceeds the face value of the original policy, the assured has the privilege of taking a paid-up policy for the full amount of the original policy, drawing the *excess* on the cash basis; or the paid-up policy may be issued to include this excess subject to a satisfactory medical certificate of good health.

J. G. VAN CISE, Asst. Actuary.

120 Broadway, N. Y., Jan. 1, 1891.

Plaintiff did not know whether or not the green slip— Exhibit II—was attached to the policy when issued by the defendant. The written portion of the slip was in the handwriting of Halsey. Plaintiff testified that Exhibit II contained the figures and representations upon which he made the application for the policy; that when he received the policy, and the green slip, he read the policy all over, and that he read the front of the green slip sufficiently to verify the fact that the figures given in the green slip were the same that Halsey had previously given him. On cross-examination the plaintiff testified as follows:

"When I got this policy I presume I read all of it over, the face of it and the back of it. I presume I took the policy and the green slip together, and understood from them both that I was to be paid $2,210.05. I knew nothing of this policy that they were going to pay me the surplus until it was handed to me. I never saw these figures on the back

of it, until after it was handed to me. I presume I examined the policy, and it was stated on the back of the policy that the surplus was to be, the amount apportioned by the society in 1911; but that was a condition afterwards, after the policy was paid for, and after the other contract had been entered into. I think I read the green slip while it was attached to the policy. I do not think I read the back of the green slip at that time. We had talked over what was on the front of the green slip before he had filled it in, and I knew what he was going to put in there. I read over the front of the green slip at the time, to verify what he had said to me during his conversations. I noticed at that time that there was a statement on the front of the green slip that it was an 'illustration blank'; but I did not notice at that time the statement on the front that the results given were given on the basis explained on the other side of the sheet. I presume that is stated very plainly on the front of Exhibit II. I have read over the back of the green slip. I presume I read it over about the time it matured. Because the figures had been talked over with Mr. Halsey and myself for several meetings when he solicited my insurance, and when I saw the figures verified that he willingly put in there, I took it for granted that that was all there was to it. I don't suppose I paid very much attention to it."

It is conceded by counsel for the defendant that the figures in the green slip were undoubtedly correctly inserted by Mr. Halsey; that they were correctly computed from the agents' book of the Equitable, and were inserted in the green slip under exactly the conditions which they were given in the agents' book, and were authorized to be used. The application signed by the plaintiff provided, among other things, as follows:

## "VI. Tontine Profits.

"At the end of the tontine period, if the person proposed for assurance be then living, and the policy in force, the policy shall participate in the accumulated surplus derived from the policies on the free tontine plan, both existing and discontinued, as may then be apportioned by the society.

"VII. Choice of Privileges at the End of the Tontine
Period.

"The policy may then be surrendered for its full value,
consisting of the entire *reserve* and the *surplus* then ap-
portioned by the society."

Certain free tontine tables contained in the agent's book
in use by defendant's agents in 1891 were offered in evi-
dence by plaintiff and received, from which the following
are extracts:

"Tables for 1891 to illustrate the advantages of tontine
policies and bonds based on the results of tontine policies
maturing in 1891."

"Important.—The society issues official illustration
blanks. The figures in this book are to be used in filling
up these blanks. They are to be used in no other way.
In no case are they to be given in letters, or on slips of
paper, or on any but the society's official blanks. See that
in each case the appropriate figures are correctly given
on the proper blank. This book is to be used only during
the year 1891, in filling up blanks dated 1891."

"Note.—The amount of profits which will be distrib-
uted among the holders of the free tontine (and semi-
tontine), policies and bonds of the Equitable Life Assur-
ance Society of the United States cannot be stated in ad-
vance, but calculations based on the experience of the past
under tontine policies which have matured show approxi-
mately the surplus profits which would be payable with
such policies and bonds if they had been issued in the
past and matured today. While the results of the future
must necessarily depend on the experience of the future,
figures based on past experience furnish the best attain-
able data upon which to judge of the management of the
society, and the value of its policies. These tables are
prepared annually to enable agents to give illustrations
based on the actual result of policies maturing during the
year in which the illustrations are given. This book is to
be used only during the year 1891 in filling up the society's
official blanks issued for 1891. Dated January 1, 1891."

Counsel for the defendant concede that the agent, Hal-
sey, was authorized to fill in the blanks in the green slip
from the book in the manner which he did, but claim that

he had no authority to attach such paper to the policy. The plaintiff paid his premiums for the full period of 20 years, and then elected to take the cash surplus of $2,210.05, the amount given in the green slip. The defendant offered him $907.90, which it claimed was the surplus dividend apportioned to his policy at the completion of the tontine period, in accordance with the agreement in the policy and the application. The plaintiff refused to accept this sum, and this suit was commenced.

The trial court directed a verdict for the plaintiff for $2,210.05 and interest, and a judgment for the plaintiff was entered. The defendant has brought the case here upon writ of error, and under appropriate assignments of error it urges two grounds for reversal:

*First.* That the trial court erred in admitting in evidence the illustration blank or green slip (Exhibit II), as forming any part of the contract of insurance in the case, or as operating in any way to alter, modify, vary, or explain the terms of the contract between the parties as expressed in the policy and the application, which, taken together, constitute by their terms the entire contract between the parties.

*Second.* Assuming the illustration blank (Exhibit II) to have been properly received in evidence, and to have been properly considered a part of the contract of insurance, its construction was for the court; and the trial court's construction of the exhibit was erroneous as a matter of law.

1. Upon the first ground it is urged by plaintiff that it clearly appears that Mr. Halsey was duly authorized to solicit this insurance, that it is conceded that he had authority to fill in the green slip with the figures taken from the book furnished by the defendant to its agents, that this green slip was furnished by the defendant over the signature of its assistant actuary, J. G. Van Cise, and that the application, the policy, and the green slip made up and constituted the contract of insurance. There is

added force in this position from the fact that this paper is expressive of promises and agreements: For example, note the language contained on the back of Exhibit II. Is it clear that the words "this policy" restrict the contract to Exhibit I? Upon this subject see the language of the Supreme Court of Wisconsin in *Timlin* v. *Assurance Society*, 141 Wis. 276 (124 N. W. 253). We do not find it necessary to pass upon this question; for, if we were to hold that Exhibit II constituted a part of the contract, that holding would not be decisive of the case, for the reason that it did not constitute an agreement on the part of the defendant to pay a definite or agreed amount of surplus upon this policy.

2. If it were conceded that Exhibit II was properly received in evidence, we are of opinion that the trial court, in determining that it constituted an agreement on the part of the defendant to pay a definite or guaranteed amount of surplus upon this policy, incorrectly construed its language. We have here set out in full both exhibits I and II, that they may the more readily be construed together. A careful consideration of these instruments leads us to the conclusion that a reasonable construction of them shows that the amount of surplus is not fixed or definite, and could not be determined until the end of the tontine period, at which time it would be apportioned by the defendant, and that, if the experience of the defendant during the said tontine period should prove to be the same as its experience had been in the preceding 20 years, the surplus would amount to the estimate given, but otherwise not, and that the future alone could decide what the amount of the surplus would be, but that there would be some surplus was guaranteed.

Speaking of Exhibits I and II in its charge to the jury, the trial court said:

"I think these papers must be construed together, and it must be determined that under these papers, constituting the contract, the surplus was fixed at not less than $2,210.05. With that view of the testimony and the pa-

pers, I think the court would be in duty bound to direct a verdict here for that amount, plus the interest."

We cannot agree with the trial court in this construction. That the plaintiff was bound to know the contents of Exhibit II is very clear. *Cleaver* v. *Insurance Co.,* 65 Mich. 527 (32 N. W. 660, 8 Am. St. Rep. 908); *Cook* v. *Insurance Co.,* 84 Mich. 12 (47 N. W. 568); *Avery* v. *Assurance Society,* 117 N. Y. 451 (23 N. W. 3). The construction of Exhibit II by the trial judge overrides the following express statements:

"The surplus (popularly known as 'profits' or 'dividends'), which is a varying quantity, depending on future experience.   *   *   *
"The *surplus* is guaranteed also, but its *amount* cannot be determined in advance. Calculations, however, based on the experience of the past, show approximately the surplus profits which would be payable with such a policy, if it had been issued by the society 10, 15, or 20 years ago, and ended its tontine period today.   *   *   * While the results of the future must necessarily depend on the experience of the future, figures based on past experience furnish the best attainable data upon which to judge of the management of the society, and the value of policies now offered."

We think that the clear weight of authority is against the construction of the trial judge. We have examined the following cases cited by counsel for defendant, and they support the position claimed for them: *Avery* v. *Assurance Society, supra; Grieb* v. *Assurance Society* (C. C.), 189 Fed. 498, affirmed in 194 Fed. 1021, 114 C. C. A. 658; *Langdon* v. *Insurance Co.,* 199 N. Y. 188 (92 N. E. 440); *Untermyer* v. *Insurance Co.,* 128 App. Div. (N. Y.) 615 (113 N. Y. Supp. 221). We have not the space to quote from these authorities, as we might do with profit.

The plaintiff relies upon and cites the cases of *Timlin* v. *Assurance Society, supra,* and *Equitable Society* v. *Meuth,* 145 Ky. 160 (140 S. W. 157). In *Timlin* v. *Assurance Society, supra,* a life policy in the usual

form contained a printed provision that, on the completion of the tontine dividend period, insured might continue the policy for the original amount and apply the tontine dividend to the purchase of an annuity. Plaintiff brought action to enforce his claim, alleging that it had been stipulated in the agreement that the annuity, beginning at $53.47 and increasing annually, should be for life, and that he was entitled to its value, namely $750. It is clearly pointed out in the opinion that the option selected by the plaintiff contained a promise of a life annuity, beginning with $53.47 and increasing annually. That case can be distinguished from the instant case in several important particulars: There the paper corresponding to Exhibit II here read as follows:

The Nonforfeitable and Incontestable Semi-Tontine Policy.
Equitable Life Assurance Society of New York.
[These estimates are the authorized figure of the Society.]
Policy $1,000.00.    Age 34.    Annual premium, $33.26.    Total cost in 20 years, $665.20.    Kind of policy, life in 20 payments: tontine 20 years.

If policy holder is alive and policy is in force at the end of tontine period, you are then entitled to either of the following options:

(1) Withdraw in cash—
    Guaranteed legal reserve in policy is _____    $514.31
    Guaranteed surplus is estimated at_____    591.69

        Total, cash_____ $1,106.00
(2) Take paid-up policy if in good health
    for _____ $2,150.00
(3) Take a life annuity, increasing annually, beginning with _____    53.47
    And besides have your original policy carried till death, free of cost, for _____ $1,000.00

This pays you _____ per cent., simple interest, or 4.40 per cent., compound interest; besides you have been insured 20 years for $1,000.00 without cost.

Along the side of this smaller sheet was the following: "Tontine is a premium on living, not on dying. The best insurance ever devised for successful men. No technicalities—if we insure you, we will pay your claim."

It will be noted that, while the word "estimates" occurs in the heading of this paper, the only item in it which is specially stated to be estimated is the "guaranteed surplus." That suit was not for surplus, but for the annuity mentioned. The language was:

"(3) Take a life annuity, increasing annually, beginning with $53.47."

There was no reference to a basis upon which the estimates were calculated; no warning that the amount of surplus "cannot be determined in advance," or that "the results of the future must necessarily depend on the experience of the future;" no declaration in any of the papers that "no dividend will be declared on this policy" until the end of the tontine period. We do not think that case controlling here.

In the case of *Equitable, etc., Society* v. *Meuth,* *supra,* it appeared that the figures stated in the contract were not estimates at all, but were absolute statements of amounts, fixed and definite, as follows:

"A choice of six methods of settlement upon the completion of the tontine period on the 23d of October, 1910, namely: (1) The surrender of the policy for its full value, consisting of the entire reserve, amounting to $456, together with the surplus then apportioned by the society, $544, either in (1) cash, $1,000; (2) paid-up assurance, $2,000; (3) a life annuity; or (II) the continuance of the policy and the withdrawal of the accumulated surplus, either in (1) cash, $544; (2) paid-up assurance, $1,000; (3) an annuity."

The cash surplus of $544 was sued for. In the list of privileges indorsed on the back of the policy the figures "$544," "$2,000," "$544," and "$1,000," were written in pencil. Meuth testified that when he received the policy by mail it contained those figures. The defendant did not plead any attempted spoliation of the policy. It did not deny the issuance of the policy, and the court held that its answer put nothing in issue, except the effect of the contract, and the plaintiff recovered, and the judg-

ment was affirmed. We think that the case is readily distinguished from the instant case.

For the error pointed out, the judgment of the circuit court is reversed, and a new trial granted.

MOORE, C. J., and STEERE, McALVAY, BROOKE, OSTRANDER, and BIRD, JJ., concurred. KUHN, J., did not sit.